BRAND, Banking Com'r, v. FERNANDEZ et al.

No. 9599.

Court of Civil Appeals of Texas. San Antonio.

Oct. 30, 1935.

Rehearing Granted and Cause Reformed and Affirmed Jan. 15, 1936.

Rehearing Amended March 4, 1936.

Seabury, Taylor & Wagner, of Brownsville, Hirshberg & Powell, of San Antonio, and Davenport & Ransome, of Brownsville, for appellant.

John H. Mitchell, of La Feria, for appellees.

SMITH, Chief Justice.

The appeal rests upon a voluminous record, through which the main transaction winds a sinuous and complicated course, which may be delineated only by a

full statement of the material facts. As the judgment rests upon a directed verdict, we are without the benefit of authoritative findings of fact, which must be here eked out of the record and, where issuable, resolved, not in support of the judgment, but against appellees. This rule of presumption arises from the action of the trial court in taking the case from the jury and directing their verdict as if all the evidence raised only questions of law.

The controversy grows out of the conduct of, and transactions between, three officials of two Brownsville banks, the Texas State Bank & Trust Company, hereinafter designated the "State" Bank, and the State National Bank, herein called the "National" Bank. One of the parties, Joe Celaya, Jr., was cashier of the State Bank, and the other two, A. H. Fernandez and John G. Fernandez (brothers), were officials of the National Bank. Apparently the three were close friends.

The "corpus" of the controversy consisted of a series of five numbered promissory notes, each for approximately $43,000, executed by A1 Parker Securities Company, indorsed by various sureties, and secured by first lien upon 2,977 acres of land in Cameron county. These notes will be herein referred to as the "Parker-Barreda" notes. And, as the case involves various large sums of money, such sums will be referred to in round numbers, only.

On July 16, 1930, Celaya and the two Fernandez brothers embarked upon a joint adventure, or trust agreement, or partnership, to purchase the five Parker-Barreda notes, for which they paid $150,000 in cash, to which each contributed one-third, $50,000. This venture was evidenced and controlled by a written contract, executed by Celaya and the two Fernandez brothers, in which it was stipulated: (1) That the Parker-Barreda notes were to be purchased with funds advanced in equal parts by the three joint adventurers; (2) that the title and exclusive control and management of the purchased securities should be placed in A. H. Fernandez, as trustee, to be administered by him according to the dictates of his own judgment "so long as he continues as such (trustee), to do any and all things which his and his advisers' judgment may dictate, looking to fully realizing for the benefit of all three of us," but that the power was reserved "for any two of us or our respective assigns * * *

to at any time in writing cancel all powers vested in" said trustee, "and appointing another trustee" in his place; (3) that "we, the said J. G. Fernandez, A. H. Fernandez, and Joe Celaya, Jr., each furnished" one-third of the purchase price of said vendor's lien notes; and (4) "it is here now agreed that said" three parties "each respectively own an undivided one-third interest in all properties and rights evidenced by the" conveyance of said notes from the prior holder to said A. H. Fernandez as trustee; and (5) that said Fernandez, individually or as trustee, shall not "be held responsible for any mistake he may make in handling the matters herein involved"; (6) that either of the three said parties may "at any time we elect to do so, sell and dispose of any portion of or all rights, titles and interests we respectively then have in the matter covered by this agreement (after first giving the other members an opportunity to purchase at the price offered), but we agree that in the event of such sale the purchaser or purchasers' rights in said matters shall be governed and controlled by the provisions of this agreement, as to all rights and interests so conveyed to such purchaser or purchasers"; (7) that the said trustee shall have "full authority to incur all reasonable expenses, including attorney's fees, at any time, which in his judgment or that of his said attorney may require for properly discharging his duties as such trustee," and all such charges and expenses shall be paid out by the trustee before any distribution to the parties; (8) "that in the event of the death, resignation, or removal of said Fernandez, trustee, as hereinbefore provided, it shall be his duty, if living, and, if not, then the duty of his heirs, assigns * * * to at once deliver to the said J. G. Fernandez and Joe Celaya, Jr., their heirs, assigns * * * all properties and records of every character and nature, theretofore in his possession, or under his control, as such trustee, to the end that any two of us, our respective heirs, assigns * * * may take such steps or action or actions * * * as they desire."

Upon that agreement, in writing, which was never added to, modified, or substituted, the project was put afloat, and the trustee proceeded, under the powers delegated to him, in the administration of the trust, collecting upon the principal and interest of the vendor's lien notes purchased, extending those obligations, lending to oth-

ers out of the common fund, incurring and paying expenses, distributing accruing dividends to the three individual members of the trust, one-third of which he paid over to Celaya as his proportionate share.

This brings us to the question—which is quite material to this inquiry—of the means employed by Celaya and A. H. Fernandez in financing their respective contributions to the joint venture, to which each contributed $50,000 as his one-third. Celaya raised $25,000 of his part by borrowing the amount from the Fernandez (National) bank, covered by his personal note, whereas, on the other hand, Fernandez raised $25,000 of his part by borrowing the amount from Celaya's (State) bank, as a "personal loan" upon his "personal note." These two notes were made to mature on the same date, presumably on September 1, 1930, with a private understanding between the two that Fernandez could "get his note back whenever he wanted it." Fernandez' note was presented by Celaya to his board of directors in the usual manner of such transactions, and without any intimation to the board of its purpose, or of the private understanding between Celaya and Fernandez that it could be withdrawn, or that the transaction was to be other than an ordinary loan in due course of the bank's business. Upon that sort of presentation by Celaya, the board approved the loan, and Fernandez got the amount thereof in cash from the bank, and used it in making up his contribution to the trust venture. At its maturity, in accordance with their private understanding, Celaya withdrew the Fernandez note from the file of his (State) bank, and surrendered it to Fernandez, who, in turn, and as consideration, withdrew Celaya's note from the National Bank, and surrendered it to Celaya. By this process the two obligations to the two banks were discharged, without any consideration passing to either bank. The consideration was made personal to the obligors, who discharged the same by the simple device (available to them as executive officers of their respective principals) of withdrawing from their banks and exchanging their two notes of even date, amount, and maturity. This transaction was explained and justified, to their own satisfaction, by the two obligors, as will be hereinafter shown.

Celaya's withdrawal of the Fernandez note from the State Bank, without payment, left an unexplained void in the assets of the bank, throwing the latter's books out of balance. To remedy this Fernandez executed a new note, for $30,000, which Celaya put in the bank in lieu of the original note, and note 4 of the Parker-Barreda series was attached to the renewal note as collateral. The variance in the amount, as well as appellees' claim that the renewal note was a mere "bookkeeping," or accommodation, note, will be explained hereinafter. This renewal note, with the collateral Parker-Barreda note, was presented by Celaya to his board of directors without qualification or any explanation that would take it out of the due course of an ordinary bank loan, and the board approved it upon that hypothesis. It was twice renewed and approved by the board under similar circumstances, for varying amounts; the last renewal being for $27,000. The renewals were all made by Fernandez with the private understanding with Celaya, as in the case of the original note, that Fernandez could get the paper back whenever he wanted it. It should be stressed here that, in presenting Fernandez' original and renewal notes to the bank's board of directors for approval or rejection, as well as in presenting those obligations to the state bank examiners on their periodical inspections, Celaya represented, in effect, that the proposed loans were regular and bona fide, and the notes unqualified assets of the bank, and, upon such representations of Celaya, they were approved as such by the bank directorate and bank examiners.

The transaction thus ran its course until April 16, 1932, when Celaya, in accordance with his prior agreement with Fernandez, withdrew the latter's current renewal note from the note file of the bank, surrendered it to Fernandez without consideration, and marked it paid on the books of the bank. To cover this abstraction Celaya left the collateral note No. 4, of the Parker-Barreda series, in the place of the abstracted paper, and carried it therein for the amount of the abstracted note. Celaya, in due course, presented the substituted obligation, without qualification, to his board of directors, thereby obtaining the board's approval of it as an asset of the bank. By the same process it was passed upon by the bank examiners, without criticism. A few months later the bank failed, and its affairs were taken over by appellant, Brand, then state banking commissioner, as provided by law.

Now it is the contention of appellees that the State Bank was a party to the purchase of the Parker-Barreda notes and in the operations under the trust agreement by Celaya and the Fernandez brothers; that the bank thereby acquired one-half of the one-third interest purchased in Celaya's name; that, by reason of that relation to the deal, the bank did not, as pledgee, acquire or own Parker-Barreda note No. 4, as collateral to the loan to Fernandez, but held it as evidence of its ownership of an undivided one-sixth interest in the whole series of five Parker-Barreda notes. This contention of appellees is based upon the testimony of Celaya, corroborated in some of its details by that of Fernandez, to this effect:

The scheme of purchasing the Parker-Barreda notes originated with Celaya, who presented it to the Fernandez brothers, and the three agreed to make the venture. It was understood between the three that the State Bank "was going to buy a one-sixth interest and" Celaya "was going to buy a one-sixth interest," the Fernandez brothers taking the remaining two-thirds. The three discussed "how this was to be handled." They submitted the matter to their counsel, and, upon the latter's advice that such venture on the part of the bank might subject that institution to embarrassment under the usury statutes, it was "decided" by the three that Celaya "should carry the bank's share for a while, and then turn around and sell it to the" bank. The three then proceeded to finance the project, as hereinbefore shown, whereby Celaya and A. H. Fernandez each borrowed $25,000 from the other's bank, upon their personal notes, which they afterwards withdrew from their respective banks, and surrendered to each other, without accounting therefor to the banks. As has also been shown, Fernandez, through Celaya, substituted a new note for $30,000 in lieu of the withdrawn note for $25,000, attaching the Parker-Barreda note as collateral, and renewed it from time to time, the last renewal being for $27,000; the latter note was in turn taken by Celaya from the file of the bank, marked paid on the bank's books, and surrendered to Fernandez, leaving in its place said note No. 4 of the Parker-Barreda series, which was thereafter carried among the bank's assets for the amount of the withdrawn note. It further appears that trustee Fernandez collected notes Nos. 1 and 2 of the Parker-Barreda series,

and, after numerous deductions, distributed the balance of the proceeds, as dividends, to the Fernandez brothers and Celaya, and the latter credited the amounts, so received by him, equally, to the current Fernandez note in the bank and himself, each as representing one-sixth interest in the trust adventure.

Under the above contentions it is the theory of appellees that the $25,000 gotten by Fernandez from the State Bank operated to offset the same amount gotten by Celaya from the National Bank, which, it is contended, was paid by Celaya into the trust adventure as the State Bank's contribution thereto, wherefore the State Bank was out only $25,000, represented by the amount it paid to Fernandez upon his original note; that, Fernandez' original note having been surrendered to him by Celaya, his subsequent renewals were mere "bookkeeping" notes, executed as accommodation obligations to the bank, and, being without consideration, were not enforceable against him.

The record does not disclose at what juncture in the administration of the trust Celaya "turned around and sold" to his principal, the bank, an undivided one-half of his interest in the project. The bank, as such, was never a party to the written trust agreement, which excluded the bank from any benefit conferred and liabilities imposed therein by express recitals that the trust was to be administered for the "benefit of the three of us," that the trust fund was "furnished" in equal parts by the three men, and that those individuals "each respectively own an undivided one-third interest in all the properties and rights" acquired through purchase of the Parker-Barreda notes. To meet this obstacle, appellees advance the theory that Celaya was, in effect, the bank, and that in his dealings with his fellow adventurers he represented himself, upon one hand, and the bank, as its cashier, upon the other; wherefore the bank was bound by his acts throughout.

To sustain this position appellees rely upon the testimony of Celaya. Celaya testified that he informed some of the directors, individually, of his dealings in this matter, but admitted that the subject was never brought before the board of directors, as a body, and that he purposely refrained from presenting it to the board in order to conceal the transactions from one

of the directors, who was a guarantor of the Parker-Barreda notes constituting the assets of the trust. At least one member of the board denied that Celaya ever mentioned the transaction to him, or that he had any knowledge of it, and it was admitted by Celaya that another member, Barreda, knew nothing of it. No member of the board testified to any knowledge of it. The result is that the question of knowledge of the individual directors, even if material, was one of fact, which must be resolved against appellees in appraising the action of the trial court in directing a verdict in their favor.

The whole record shows, indisputably, that Celaya initiated the negotiations which resulted in the formation and operation of the trust, that he bought and paid his own money for his one-third interest in the venture, and that, if the bank ever acquired any interest therein, it did so only through purchase from Celaya, its cashier, in which, in a dual capacity, he represented himself as the seller and his principal, the bank, as the buyer—all without the official sanction of the bank's directorate. Apropos, it appears from the record that all the entries relating to the transactions between Fernandez and the State Bank were made in the bank's books by Celaya, and those passed upon by the bank directorate were maneuvered through the directors' meetings by Celaya himself, who uniformly concealed from the board the facts now relied upon by Fernandez to bind the bank by Celaya's conduct.

It should be added, as a possible material consideration in disposing of the case, that, when Celaya took the last renewal of the Fernandez note from the bank's note file, marked it paid on the bank's books, and surrendered it to Fernandez without consideration, the security for the Parker-Barreda notes had become seriously impaired, if not definitely inadequate; whereas that security was ample at the inception of these transactions, when the bank lent the $25,000 to Fernandez upon his note.

Now, when the banking commissioner took over the affairs of the State Bank, he found among its paper assets the collateral note left there in lieu of Fernandez' $27,000 renewal note, which Celaya had secretly withdrawn and surrendered to Fernandez and marked paid on the bank's books. The commissioner, nonplused, investigated, and developed the facts upon which he afterwards instituted this action to recover upon Fernandez's abstracted renewal note, as well as upon the collateral note, and to foreclose upon the lien to secure same. On the other hand, Fernandez, as trustee in the trust adventure, brought suit to recover and foreclose upon the unpaid Parker-Barreda notes, including note No. 4, held by the commissioner as collateral, asserting that the bank's interest was not that of a pledgee of said note No. 4, but that of a one-sixth share in the remaining unpaid notes of the series purchased under the trust agreement. The two suits were consolidated below, and Fernandez recovered as prayed for, thereby restricting the bank's recovery to a one-sixth interest in the three unpaid notes, rather than as pledgee of note No. 4. The commissioner has appealed from that judgment. The appeal must be determined by conclusions of law arising from the foregoing statement of the facts.

At the time Celaya took Fernandez's renewal note from the note file of the bank, that note was, on its face, a binding obligation of the maker, and it and the Parker-Barreda note, attached to it as collateral, were carried as assets of the bank. Celaya had presented those obligations to the board of directors, without qualification, and without informing them of, but designedly concealing from them, the fact of his private understanding with Fernandez that the note was but a "bookkeeping," or accommodation, note, or that it was subject to any other vices. So had Celaya, by like representation and device, procured the state bank examiner's approval of those obligations as proper assets of the bank. The consequence is that when the bank failed shortly thereafter, and the banking commissioner assumed charge of its affairs, he could presume—was required by law to presume—that those obligations were lawful assets of the defunct bank, and in default of payment could and did properly sue thereon. Shaw v. Borchers (Tex.Com. App.) 46 S.W.(2d) 967, 969. The burden rested fully upon Fernandez to plead and prove, and elicit affirmative jury findings upon, such facts as would, in law, relieve him of liability. We are of the firm opinion that Fernandez did not meet this burden below, at least to the extent of empowering the trial judge to direct a verdict in his favor thereon.

In the first place, it is perfectly obvious that the bank was not a party to the original joint adventure. This is made plain by the undisputed testimony of Fernandez himself, as well as of Celaya, that the Fernandez brothers and Celaya "decided" to, and did in fact, leave the bank out of the deal for an indefinite time, rather than subject it to a charge of usury. It is further and conclusively evidenced by the written agreement under which the adventure was set up and thereafter operated, in which it was recited that the Fernandez brothers and Celaya had each "furnished" one-third of the purchase price of the property acquired and operated by the trust, and that "each respectively own all the properties and rights" in that property, to be operated "for the benefit of we three." The trust agreement, by thus excluding the bank from ownership and benefit, confirmed the "decision" of the three joint adventurers to leave the bank out of the deal. It is true that the three further "decided" that after "a while" Celaya could "turn around and sell" one-half of his "share" to the bank, but the effect of that reservation was to further confirm the fact that the bank was excluded from the deal.

■ The result is that, if the bank ever became a member of the partnership or joint adventure, it did so by purchase from its cashier, Celaya, of a part of his interest in the joint adventure. When or by what process the sale occurred is not apparent from the record. It is certain that, if made at all, it was made by Celaya himself, acting in a dual capacity, in which he, as cashier, was the seller and the bank, his principal, was the buyer. Conceding, for the purpose of this decision, that the bank could lawfully become a shareholder in the project, an attempted sale thereof to the bank by its cashier could not bind the bank, except upon a showing that such purchase, from the cashier, was not only approved by at least a majority of the members of the board of directors, with knowledge of all the material facts, but that it was, at least apparently, beneficial to the bank. First State Bank & Trust Co. v. Davidson (Tex.Civ.App.) 260 S.W. 922; State Nat. Bank v. Davidson (Tex.Civ.App.) 295 S.W. 311, and authorities cited; Amarillo Nat. Bank v. Harrell (Tex. Civ.App.) 159 S.W. 858. These conclusions rest, primarily, upon the evidence, which, if issuable, should have been submitted to the jury in this case.

And, according to the authorities cited, while it is true that, if the venture was one upon which the bank could lawfully enter, the unauthorized acts of the cashier therein could have been subsequently ratified by the board of directors, nevertheless the bank could be held to such ratification only upon a clear showing that the confirming acts of its officials were done with full knowledge of all the material facts surrounding the transaction. The evidence in this record raised those issues of fact in this case, and the trial court erred in withholding those issues from the jury.

■ With reference to the issues of ratification and of benefits received by the bank, Fernandez cites, in support of his contention, the fact that, as dividends were paid by him to Celaya, upon the latter's one-third share in the adventure, Celaya in turn credited one-half of those dividends upon Fernandez's note to the bank, until Celaya withdrew that note and surrendered it to Fernandez, after which such credits were made upon the Parker-Barreda note left in the bank in lieu of that note. Upon their ·face such payments had no more effect than that imported in the entries thereof, to wit, payment of interest or partial payments upon the principal. If in fact they represented no more than dividends paid the bank as a shareholder in the joint adventure, as Fernandez contends, they could not be given effect, in law, as benefits derived from the adventure, or in ratification of Celaya's authority to bind the bank, unless the other officers and directors of the institution were apprised of the peculiar facts which gave them the claimed effect. The true facts of this angle of the case are determinable from the evidence in the case, which, if not conclusive against Fernandez, at least raised issues which should have been submitted to the jury.

■ And, finally, the powers and functions of a state bank and trust company as defined by our statute include the power to purchase "securities," which concededly include vendor's lien notes, such as the Parker-Barreda notes constituting the original assets of the joint adventure, here involved. Article 396, R.S.1925.

But such powers do not include the power of such institution, or of any corporation, for that matter, to directly surrender to others such as Fernandez the trustee of the joint adventure in this case, the ex-

clusive control and management of a substantial part of its investments or assets, or to enter into a contract, such as here involved, whereby its officers and directors, duly elected and empowered to control and manage its affairs, divest themselves of those powers and delegate them to strangers. A.&E.Encyc.Law, p. 794; Fletcher's Enc.on Corps. §§ 841, 842; 10 Tex.Jur. p. 885, § 248; First State Bank v. Sanford (Tex.Civ.App.) 255 S.W. 644; Markowitz v. Greenwall Theatrical Circuit Co. (Tex. Civ.App.) 75 S.W. 74, 75, reversed upon other grounds, 97 Tex. 479, 79 S.W. 1069, 65 L.R.A. 302; Sabine Tram Co. v. Bancroft, 16 Tex.Civ.App. 170, 40 S.W. 837.

Conceding, therefore, for the purposes of this decision, that Celaya was acting authoritatively for the bank throughout the transaction, and the bank thereby at some juncture became a party to the trust agreement, the contract was beyond its corporate powers, and therefore void, since the contract, if enforced, would have deprived the officers of the bank of their power of control and management of a substantial portion of the bank's assets, for an indeterminate period, in contravention of the rule stated.

The result of the foregoing conclusions is that if, for any of the stated reasons, the bank was not bound by the acts of Celaya, it was entitled to recover upon Fernandez' note, as well as upon note No. 4 of the Parker-Barreda series, as collateral, and to foreclose the lien securing the latter obligation, in satisfaction of its judgment, after allowing all credits to which the obligor may show himself entitled. We therefore sustain appellant's (Brand's) second, third, and sixth propositions of law, and reverse the judgment and remand the cause for a new trial, for all purposes, in consonance with this opinion.

A. H. Fernandez, as trustee, as cross-appellant, complains of a provision of the judgment postponing sale under the decree of foreclosure obtained by him upon the unpaid Parker-Barreda notes. Of course the reversal here, of the judgment as to Brand, carries with it a reversal of the judgment obtained by Fernandez, as trustee, rendering it unnecessary to adjudicate the matter of which Fernandez complains. We deem it proper to add, however, in view of a new trial, that we think the trial court erred in postponing the enforcement of the remedy accorded Fernandez. We do not think the trial court materially erred in consolidating the two original actions, which may be properly tried together.

In order to adjudicate the costs of appeal, it should be stated that the land covered by the lien to secure the Parker-Barreda notes is being administered by J. H. Mitchell, receiver, at whose instance the trial court erroneously postponed the remedy accorded Fernandez, trustee, resulting in the latter's successful appeal, as cross-appellant herein, from that part of the judgment. By this process the receiver should be cast for part of the costs of this appeal.

The judgment is reversed and the cause remanded, at the joint cost of Fernandez, trustee, and Mitchell, receiver.

### On Motion for Rehearing.

All parties actively participating in the appeal have filed vigorous motions for rehearing, seeking divers specific remedies, including reformation, rendition, and affirmance. Those motions are enlightening and informative, affording a clearer view and a more helpful presentation of questions of both law and fact involved in the appeal. In response to those motions, this court has gone back through the record and thoroughly reconsidered the whole case, in consequence of which we are impelled to a stronger adherence to or extension of some of the holdings and revision or modification of others.

■ 1. We adhere to the holding that under the evidence in the case the trial court was not authorized to assume that the State Bank became a shareholder, with the Fernandez brothers and Celaya, in the joint adventure for the purchase of the Parker-Barreda notes. We now go further and hold, as a matter of law, under the undisputed facts, that the bank was not bound by Celaya's acts purportedly in its behalf in that matter.

■ 2. While adhering to the ruling that under the evidence A. H. Fernandez became personally liable to the bank upon his original note for $25,000 and the several renewals thereof, we hold, further, that, when Celaya removed the last of said renewals from the bank, marked the same paid on the books of the bank, and presented the Parker-Barreda collateral note No. 4 to the board of directors and obtained that body's approval of that note as a substitute for the withdrawn personal

obligation of Fernandez, the bank was bound by that approval, and thereby released Fernandez from the personal obligation. It does not seem to matter whether Celaya properly or improperly abstracted and canceled the Fernandez note; there is no showing that he fraudulently obtained the board of directors' approval of the Parker-Barreda note as a substitute for the personal obligation, which approval the board gave without criticism. The board had that power of approval, and, having given it with full knowledge of its effect, the bank was bound thereby, and Fernandez' release from personal liability was thereby effectuated. This conclusion requires the withdrawal of our original holding that Fernandez was personally liable upon the $27,000 note upon which the banking commissioner sought recovery against him.

■■■ 3. We recede from the holding that the trial court erred in ordering the sale of the land involved through the receiver having control and possession thereof under the orders of the court in which the receivership is pending, and in which the present suit was tried, rather than by the sheriff on direct order of sale. It seems that John H. Mitchell is receiver of this land as well as all the other properties and assets of Al and Lloyd Parker, Inc., owners of this land. The validity of that receivership proceeding was not brought into question in this suit, and it is not deemed within the prerogative of this court in this action to make any orders which would restrict or interfere with the administration of the affairs encompassed in that receivership.

Undoubtedly the trial court, having jurisdiction over both the receivership and this proceeding, had the power, exercisable in its discretion, to order judicial sale of the property herein foreclosed upon, notwithstanding it was in the possession of the receiver, under proceedings in another action in the same court. But, the receivership not being questioned in this action, and therefore presumably valid, we are of the opinion that it was within the discretion of the court to direct that the sale be made by the receiver rather than in a judicial sale under execution. 36 Tex. Jur. p. 205, § 100.

Fernandez, trustee, relies principally upon the case of Houston Ice & Brewing Co. v. Clint (Tex.Civ.App.) 159 S.W. 409, for support of his contention that the trial court should have ordered sale of the land involved by the judicial processes provided by statute in cases of foreclosure. But that case is effectually distinguishable from this by the fact that it was shown in that case that the validity or necessity for the receivership had terminated, and there was nothing left to do but sell the security, which the court ordered done as under execution; whereas, in this case, the condition of the receivership was not shown below, nor was its validity or necessity questioned. We think, under this showing, that it was discretionary with the court having jurisdiction of both proceedings to determine the question of whether the property foreclosed upon should be sold as under execution, or by the receiver, in satisfaction of the judgment for debt and foreclosure.

Now, had it been shown in this proceeding that the receiver has in his possession no assets of the owner other than the property here involved, out of which the debt here sued on could be paid—in short, that there was no necessity for continuing the receivership, as in the case cited—then, undoubtedly, the judgment creditor was entitled to execution and order of sale, without reference to the receiver. 36 Tex. Jur. p. 203 and 205, §§ 99 and 100; Scott v. Crawford, 16 Tex.Civ.App. 477, 41 S. W. 697; Cushing v. B. C. Evans Co. (Tex.Civ.App.) 33 S.W. 703. But no such showing was made, wherefore the matter was left to the discretion of the court.

■■■ It is equally true, however, that the plea of the receiver that on account of abnormal business conditions, as well as a recent hurricane, the property, if sold now, would not bring a fair and reasonable price, is without any legal merit, and could not properly be considered by the court in determining the time or method of disposing of the property towards satisfying the judgment.

■■■ This court must presume that the receiver, an arm of the court below, will proceed in good faith to promptly pay off the judgment rendered in this case or sell the land involved in satisfaction thereof, in accordance with both the letter and spirit of that judgment. If he does not do so, or if the judgment creditors become dissatisfied with his course in the matter, then they may apply to that court for relief, and, if dissatisfied with the rulings of the court thereon, may appeal from such rul-

ings, 36 Tex.Jur. pp. 130, 175, 180, §§ 60, 83, 86.

4. We conclude, as well, that the trial court correctly decreed the order of issuance of executions to satisfy the deficiency, if any remaining, after distribution of the proceeds of the sale of the security.

Summarizing the holdings in the original opinion, as adhered to or revised in this opinion, we conclude that the judgment of the trial court should be reformed so as to provide as follows:

1. That the banking commissioner recover of the makers, indorsers, and guarantors the amount of the Parker-Barreda note No. 4, with principal, interest, and attorney's fees, in the sum of $56,643.42, the same being one-third of $169,930.26, as found by the trial court, with interest thereon from June 8, 1934 (the date of the judgment below), at the rate of 10 per cent. per annum until paid, together with foreclosure of the deed of trust lien upon the land involved.

2. That A. H. Fernandez, trustee, recover of the same parties defendant the amount of the Parker-Barreda notes Nos. 3 and 5, with principal, interest, and attorney's fees, in the sum of $113,286.84; the same being two-thirds of $169,930.26, as found by the trial court, with interest thereon from June 8, 1934, at the rate of 10 per cent. per annum until paid, together with foreclosure of the deed of trust lien upon the land involved.

3. That said judgment be certified to John H. Mitchell, receiver, for observance, as decreed in the judgment below, except that said receiver shall satisfy the judgment in favor of said banking commissioner and trustee, in the proportions herein adjudged, whether paid from proceeds from the sale of said land or from other funds in the hands of said receiver.

4. That, after exhaustion of the security, if a deficiency occur, same shall be made out of the makers, indorsers, and guarantors of said notes, as provided in the judgment below.

5. That the banking commissioner take nothing by reason of his suit against A. H. Fernandez, individually.

6. That the costs of this appeal be taxed against the said Fernandez, trustee.

7. That, as so reformed, the judgment will be affirmed.